IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

HARRIS V. SNOWDEN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

AHNJEL C. HARRIS, APPELLEE,

V.

BERNARD T. SNOWDEN III, APPELLANT.

Filed December 23, 2025.    No. A-25-179.

Appeal from the District Court for Douglas County: JOHN E. HUBER, Judge. Affirmed.

Bernard T. Snowden III, pro se.

No appearance for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

INTRODUCTION

Bernard T. Snowden III, pro se, appeals from the Douglas County District Court's order granting a domestic abuse protection order against him in favor of Ahnjel C. Harris. We affirm.

BACKGROUND

On January 22, 2025, Harris filed a form petition and affidavit to obtain a domestic abuse protection order against Snowden pursuant to Neb. Rev. Stat. § 42-924 (Cum. Supp. 2024), the relevant statute in effect at that time. Section 42-924 has since been transferred to Neb. Rev. Stat. § 26-103 (Supp. 2025), part of the Protection Orders Act, Neb. Rev. Stat. § 26-101 et seq. (Supp. 2025), which became effective on September 3, 2025. Since the Protection Orders Act was not yet in effect when the protection order was entered in this case, we will rely upon the statutory scheme in effect at that time.

- 1 -

Harris filed the form petition on behalf of herself and her four minor children. Harris alleged that she and the children were victims of domestic abuse, and that Snowden was the father of her two youngest children, ages 5 and 6 (her older two children were both 16). Harris gave an address in Omaha, Nebraska, for herself and her children.

Harris indicated that she and Snowden had been involved in past or current court cases together. She listed five case numbers, with no specificity as to the type of case, the name of the court, or where the court was located. Additionally, she wrote:

Dekalb County Clerk of Superior Court GA custody hearing where he took the children out of state and refused to return them. Once the children were finally returned after 4 month's [sic] he filed a contempt order where judge ruled his actions were extreme. Civil action File [number]. After fleeing from his abuse he filed a legitimation order that granted him custody. Civil Action file [number].

In the section of the form petition and affidavit asking for "[t]he dates or approximate dates and facts of the most recent and the most severe incident or incident(s) of domestic abuse, Harris alleged as follows:

A. Date/Time: 1-21-25 8:30 PM Description: Came to my residence and threatened to snap my neck if I did not give him the children. I told him I would call the police and he drove off. He was pounding on the door in a very aggressive manner.

During August 2019 he strangled me to the point I passed out, I had just given birth to our youngest son[.]

September 2019 – he threatened to kill me and said he regrets not finishing the job[.]

August 18th 2022[,] I found out that he lied on me and said that I had abused him after he came to my house threatening me and the boys. The police [unreadable] [and] arrested me due to his false allegations case dropped[.]

July of 2022 attempted to kidnap the children. He showed up at [a store] where I was followed attempting to snatch the children from my care. Police report filed.

B. Date/Time: 1-22-25 8:40 AM Description: Followed me to . . . Elementary where he kept watching me. He went into the school and demanded that they release son to him. My son was fearful and crying and was extremely afraid to go into the school fearing they would make him go with his father who has physically and sexually abused him.

Prior to 2019 he has strangled myself and petitioners multiple times. He threw my son in a dumpster. Busted his head open with a bottle my son still has scar[.] He has attacked me multiple times and while pregnant. He has called . . . CPS with false allegations to destroy my character following his abuse.

C. Date/Time: 5/2021 – 9/2021 Description: While the boys were in his care he beat [youngest child] with a belt where his leg was bleeding he has scars on his leg. Incident was reported and investigation was open. [Snowden] evaded service.

During this time he also pushed my son down the stairs.

He left them on an empty road and drove away.

He threw a child in the trash can.

He was in violation of custody order and held them for four months while they begged to return.

He showed up at my residence with a gun waving the gun in November 2019[.]

On a separate page, Harris wrote:

There is a current Harassment Protection Order in place that was granted. My father is the petitioner who [Snowden] has threatened to kill several times.

He has continued his threatening behavior due to the protection order being revised as myself and all . . . petitioners were on an order. Case [number].

The judge suggested that I apply for a separate order during recent hearing on 1-16-25.

The children as well as myself are in constant fear of not knowing when he will show up or what he will do. His record shows . . . that he has a history of this behavior.

The district court entered an ex parte domestic abuse protection order against Snowden and in favor of Harris on January 22, 2025; Harris was the only person named as a "protected party" in the order. This order was to remain in effect for 1 year. The court determined that it reasonably appeared from the specific facts included in the affidavit that Harris was in immediate danger of abuse before the matter could be heard on notice. The court ordered that Snowden was (1) enjoined and prohibited from imposing any restraint upon Harris' person or liberty; (2) enjoined and prohibited from threatening, assaulting, molesting, attacking, or otherwise disturbing the peace of Harris; (3) enjoined and prohibited from telephoning, contacting, or otherwise communicating with Harris; (4) removed and excluded from Harris' residence; (5) ordered to stay away from "[a]ll locations in which [Harris] may be located"; and (6) enjoined and prohibited from possessing or purchasing a firearm. The court awarded Harris temporary custody of the parties' two children until February 21. On February 11, Snowden requested a hearing on the protection order; his given address was in Georgia.

A hearing on the protection order was held on March 6, 2025. Snowden and Harris both appeared without counsel.

Two exhibits were received into evidence. The first exhibit contained various undated audio and video recordings offered by Snowden. The audio recordings were labeled "[Harris] denying me Convo with my sons," "[Harris] lying and promoting fear to my sons," "[Harris] real reasons she went to Omaha," and "Speaking with [Harris'] neighbor." One video showed a man starting the video recording and then moving to a punching bag in a hallway. The other three videos are of a reception desk at a gym. (It is not clear to this appellate court how the content of the four videos is related to the current case.)

The second exhibit contained various court orders. It contained a March 2020 Douglas County District Court order affirming a domestic abuse protection order; the protection order was entered against Snowden and in favor of Harris and the four children and was effective for 1 year from January 30 when an ex parte order was issued. The exhibit also contained a county court order from September 2020 in a criminal case showing that Snowden was originally charged with violating a protection order, but he pled no contest to an amended charge of disturbing the peace; there is no indication as to who the protected party was in the protection order or whose peace was

disturbed. Finally, the exhibit contained a copy of Harris' January 2025 form petition and affidavit to obtain a domestic abuse protection order in the current case.

Snowden called two witnesses. The first witness was from the Teacher Administration Building for Omaha Public Schools. She testified that Snowden contacted the office in December 2024 to find out where his son went to school, and after he provided her a court order from Georgia indicating that he had joint custody, she told Snowden which school his son attended. She also told him that he had the right to take his son out of school, but she did not recommend that he do so because she thought that would be "traumatizing." On cross-examination, the witness said that she was not aware of a current protection order at that time.

The second witness was the principal at the parties' older son's elementary school. The principal testified that she first met Snowden on January 22, 2025, around 8:30 a.m. Snowden stated that he wanted to attend the school's winter program to see his son and asked what time the program started. When he returned for the program about an hour later, the principal told him that his son was no longer in the building because his mother had "checked him out." Later that day, the principal met with Snowden, and he showed her "some paperwork about custody agreements" and "talked about wanting to be a part of [his] son's life." The principal "checked [the child's] file" on January 22 "to make sure that [Snowden] was able to be in the school" and she saw "no red flags at that time."

After the two witnesses testified, the district court stated that each party could give "a five-minute last wrap-up" and offer evidence or make a statement. Harris said she wanted to "make a statement." "The only thing that [Snowden] has questioned . . . is the January 21st event and the January 22nd event," "whether or not he was there" on those days. "[N]owhere has he ever denied the [other] allegations within . . . my affidavit"; "not once" has he "claimed or said that he would never hurt me or the boys."

The district court had a discussion with Harris about whether she violated a Georgia court order when she "fled." (No Georgia court order is included in our appellate record.) Harris explained that "[t]here was no order that was established when [she] left the State of Georgia," and the Georgia order "came into effect at the same time . . . that I had a protection order." She said, "I came to Nebraska, and they claimed jurisdiction over me and the children," "[a]nd I had a . . . protection order in place for a year." The Georgia order "is the very order that was put in place without me being present, because I was abiding by the protection order that this state granted, because they have jurisdiction," and "Georgia has never had jurisdiction."

Snowden stated, "[T]he first protection order that she's talking about, this was from 2020," and "it shows the reason why it was granted, 'cause I did not appear"; "[i]t wasn't because there was anything found or grounds." Harris responded that Snowden did not appear "because he was in Georgia." But the district court noted, "He wasn't served either. That's the problem." The court said the parties were "playing games with each other," "trying to get orders from courts when no party appears." Snowden stated he had "evidence that the court order that we have in Georgia, I notified her of this court order." But the district court said, "that's not the same thing as having her served and being a party to a case." Snowden responded that Harris "was served," "she just didn't want to come." The court replied, "She wasn't a resident of Georgia," so "Georgia didn't have jurisdiction over her at that point in time, nor did they have jurisdiction over the kids that weren't residing there"; "[t]hat order's not enforceable."

Snowden stated that he had not talked to Harris "since 2023" and had not been to her house. He said there were no police records, no arrest record, "[t]here's nothing." "All it is, is a dad trying to see his children."

On March 6, 2025, the district court affirmed the January 22 ex parte domestic abuse protection order and ordered it to remain in full force and effect for a period of 1 year from the date the ex parte order was issued.

Snowden appeals.

## ASSIGNMENTS OF ERROR

Snowden assigns that the district court erred when it (1) did not validate claims made by Harris, (2) awarded a protection order to Harris, and (3) demonstrated personal bias and prejudice against him.

## STANDARD OF REVIEW

A protection order pursuant to § 42-924 is analogous to an injunction. Thus, the grant or denial of a protection order is reviewed de novo on the record. In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Garrison v. Otto*, 311 Neb. 94, 970 N.W.2d 495 (2022).

## ANALYSIS

Snowden claims that "[t]he District Court abused its discretion" in granting Harris a protection order "based on deceiving the court and providing the court no evidence on their claims." Brief for appellant at 9. "Furthermore, the District Court judge demonstrated personal bias and prejudice towards [Snowden] through . . . words and actions, which are improper and put into question the judge[']s impartiality." *Id.*

Snowden argues that the district court "demonstrated deep seated antagonism" towards him, and points to statements purportedly made by the court in a proceeding on March 7, 2025. However, this is an appeal of the court's March 6 order affirming the domestic abuse protection order. Thus, any statements made on a later date are not relevant here. We have reviewed the record and find no statements made by the district court at the March 6 hearing or in its order entered that same day that demonstrate personal bias, prejudice, or "deep seated antagonism" towards Snowden.

We turn now to Snowden's claim that the district court abused its discretion in granting Harris a protection order "based on deceiving the court and providing the court no evidence on their claims." Brief for appellant at 9.

A show cause hearing in protection order proceedings is a contested factual hearing, in which the issues before the court are whether the facts stated in the sworn application are true. *Diedra T. v. Justina R.*, 313 Neb. 417, 984 N.W.2d 312 (2023). A protection order is analogous to an injunction, and a party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle that party to relief. *Id.* As such, the petitioner at a show

cause hearing following an ex parte order has the burden to prove by a preponderance of the evidence the truth of the facts supporting a protection order. *Id.* Once that burden is met, the burden shifts to the respondent to show cause as to why the protection order should not remain in effect. *Id.*

The Protection from Domestic Abuse Act, Neb. Rev. Stat. § 42-901 et seq. (Reissue 2016 & Cum. Supp. 2024), provides that any victim of domestic abuse may file a petition and affidavit for a protection order with the clerk of the district court. See § 43-924. Whether domestic abuse occurred is a threshold issue, and absent abuse as defined by § 42-903, a protection order may not remain in effect. *Garrison v. Otto, supra.* "Abuse" is defined in relevant part as the occurrence of one or more of the following acts between family or household members: (a) attempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument; (b) placing, by means of credible threat, another person in fear of bodily injury; or (c) engaging in sexual contact or sexual penetration without consent. See § 42-903(1). Family or household members include persons who have a child in common whether or not they have been married or have lived together at any time. See § 42-903(3).

In considering whether to continue an ex parte domestic abuse protection order following a finding that domestic abuse has occurred, a court is not limited to considering only whether the ex parte order was proper, but may also consider a number of factors pertinent to the likelihood of future harm. *Garrison v. Otto, supra.* Those factors might include, but are not limited to, the remoteness, severity, nature, and frequency of past abuse; past or pending credible threats of harm; the psychological impact of domestic abuse; the potential impact on the parent-child relationship; and the nuances of household relationships. *Id.*

Here, Harris' form petition and affidavit were received into evidence at the show cause hearing and established that she and Snowden were "family or household members" because they had children in common, and she recounted several instances of abuse as defined by § 42-901(1)(a) (attempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument) and § 42-901(1)(b) (placing, by means of credible threat, another person in fear of bodily injury). Notably, Harris recounted that Snowden "strangled" her "multiple times" prior to 2019; "strangled" her to the point she "passed out" in August 2019; threatened to kill her in September 2019; "showed up" at her residence with a gun, "waving the gun" in November 2019; and threatened to "snap" her neck on January 21, 2025. Based on the foregoing, Harris proved by a preponderance of the evidence the truth of the facts supporting the domestic abuse protection order, and no additional evidence was necessary. See *Mahmood v. Mahmud*, 279 Neb. 390, 778 N.W.2d 426 (2010) (prima facie case may be established by form petition and affidavit).

The burden then shifted to Snowden to show cause as to why the protection order should not remain in effect. *Diedra T. v. Justina R., supra.* The testimony of Snowden's witnesses did not rebut the instances of abuse noted above. Snowden himself did state that he had not talked to Harris "since 2023" and had not been to her house. He also stated that there were no police records, no arrest record, "[t]here's nothing." However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Diedra T. v. Justina R., supra.* By affirming the ex parte domestic abuse protection order, the district court clearly found Harris to be more credible than Snowden regarding the allegations

contained in her petition, and that the evidence presented by Snowden did not sufficiently rebut Harris' prima facie case for the domestic abuse protection order as established by her form petition and affidavit. We decline to disturb that finding.

After our de novo review of the record, we find that Harris' form petition and affidavit established by a preponderance of the evidence that she was a victim of domestic abuse, and Snowden did not provide sufficiently credible evidence to the contrary. Accordingly, we find no error in the district court's affirmance of the ex parte domestic abuse protection order.

## CONCLUSION

For the foregoing reasons, we affirm the district court's March 6, 2025, order affirming the January 22 ex parte domestic abuse protection order against Snowden and in favor of Harris.

AFFIRMED.